Jesse **JOHNSON** and John Johnson, for-merly partners trading as Johnson Brothers Co., Plaintiffs

v.

**FENESTRA, INCORPORATED (EREC-TION DIVISION)**, Defendant.

Civ. A. No. 61–114.

United States District Court
W. D. Pennsylvania.
Aug. 23, 1961.

Gilbert E. Morcroft, Pittsburgh, Pa., for plaintiffs.

J. Tomlinson Fort, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendant.

DUMBAULD, District Judge.

The case at bar arises under our "diversity jurisdiction" and is governed by Pennsylvania law. It was tried non-jury. This opinion shall be deemed to embody findings of fact and conclusions of law in accordance with F.R.Civ.P., Rule 52, 28 U.S.C.A. From the testimony the jury, if there had been one, could have found, and the Court as trier of the facts accordingly finds, as follows:

Defendant (hereinafter called Fenestra) was prime contractor on a job involving construction work at the Shawville plant of Pennsylvania Electric Company. The architect was Gilbert Associates. Plaintiffs, a partnership (hereinafter called Johnson), were subcontractors. They were to do the erection work, installing a certain type of material (known as "C-panels") to be provided by Fenestra. The first material so provided proved defective. After installation and inspection Johnson had to remove it, and was paid for doing so. Then several months elapsed before Fenestra supplied sufficient panels for Johnson's crews to resume work at their normal pace. (Fenestra did exhibit concern when the first material proved defective, and sent a man to Baltimore to the supplier there to investigate the cause of the trouble, and to visit the job site to supervise the handling and storage of one or two truckloads furnished in August, 1958. Some defective material was also reprocessed by the supplier and installed by Johnson before full-scale deliveries began in September, 1958.)

By reason of Fenestra's delay in supplying material, Johnson could not complete the job until the middle of March, 1959. Meanwhile his crews had been marking time unproductively, and the job was not completed until after the onset of cold weather. The need for additional precautions to protect the workmen against the weather, as well as their diminished productivity due to the cold, substantially increased Johnson's expenses and reduced his profits in performing the contract. Johnson now sues Fenestra for these items of damage, claiming that Fenestra's delay constitutes breach of contract, and that time was of the essence with respect to the delivery of C-panels at the job site, so that Johnson's crews could work uninterruptedly and efficiently.

■ The only provision relating to time of performance in the contract between Johnson and Fenestra is the following language of Art. VI: "Subcontractor shall * * * diligently and promptly prosecute the work * * * and shall not be excused for failing to meet work schedules under this or the prime contract, whether avoidable or not, unless and only to the extent that Fenestra shall be excused under the prime contract." Art. VIII incorporates by reference the terms and conditions of the prime contract. The prime contract (Sec. A–3) provided that "Work * * * must be prosecuted with sufficient equipment, labor and materials to complete the work specified in accordance with the construction schedule and the progress of the job." What is meant by the words "the construction schedule and the progress of the job" in this paragraph? We think it may be construed as the contemplated, as well as the actually completed, progress of the operations on the job, and that both of these could vary from time to time during performance in accordance with the vicissitudes affecting the work. Defendant's Brief (p. 3) concedes that "It was the understanding of Fenestra that this schedule was tentative and subject to variation at the request of the Pennsylvania Electric Company."

However, defendant Fenestra contends that the language of the contract refers to a written chart, once and for all prepared by the architect before work began. There may well have been such a chart, copies of which were used to compare anticipated and actual progress at monthly intervals. Two such progress reports (Ex. 7 and 8, dated March 31, 1960 and January 30, 1960, respectively) were put in evidence by defendant. They purport to show that the completion date for the portion of the job including C-panels was, with respect to one unit, January 15, 1959, and with respect to the other, April 1, 1959.

No explanation was given, however, why the original chart was not produced, although the witness Amick testified that the target dates never varied on the monthly report forms. However, there is no evidence that these charts were ever shown to Johnson or adopted as the "construction schedule" insofar as his work was concerned.

Plaintiff accordingly contends that the "construction schedule" for Johnson's work is to be gathered from conversations of Johnson with Gens and Cupp (representing Fenestra) and Amick (representing the architectural firm). At these talks, before either Johnson or Fenestra made their bids, the understanding was that the installation had to be completed before cold weather, so that the buildings would be closed in and workers could pursue other construction tasks inside with the benefit of heat.

■ However, even accepting the version of these talks given by plaintiff's witnesses where contradictions occur, it does not appear that they establish a contractual obligation which Fenestra has violated.

When asked whether the Fenestra representatives had ever *promised* Johnson that the work would be completed before winter (or December 1), plaintiff's witnesses replied that there had been no such promise, but that Fenestra had *demanded* that the work be completed by that time.

In other words, we feel that the expectation or understanding as to date of completion was not an agreement for the benefit of Johnson but a requirement imposed for the benefit of Fenestra (or rather, ultimately, for the benefit of the customer, Pennsylvania Electric Company).

If Johnson had insisted upon making time of the essence for his own benefit, an express stipulation to that effect would have been the appropriate method of accomplishing this objective. In the absence of such an express requirement, imposing a contractual obligation on Fenestra, the possibility of delay in furnishing material was merely one of the calculated risks which constitute a normal feature of the contracting business.

Under the vaunted private enterprise system, it must be remembered, entrepreneurship involves the possibility of loss as well as of profit, and of disadvantage as well as of benefit, depending upon the outcome of numerous unforeseen contingencies. The breakdown in production of satisfactory C-panels was such a contingency.

This conclusion is supported by a recent decision of this Court, Lichter v. Mellon-Stuart Co., D.C.W.D.Pa.1961, 193 F.Supp. 216, 220. There was no affirmative action by Fenestra which impeded proper performance by Johnson, as was the case with respect to the stone work in the Lichter case (at pages 222–223), and with respect to the models in Fuller Co. v. United States, 1947, 69 F.Supp. 409, 412, 108 Ct.Cl. 70. A closely parallel Pennsylvania case is Carroll Electric Co. v. Irwin & Leighton, 1923, 80 Pa.Super. 438, 441. See also Henry Shenk Co. v. Erie County, 1935, 319 Pa. 100, 104–106, 178 A. 662; Frederick Snare Corporation v. City of Phila., 1937, 325 Pa. 460, 462–463, 190 A. 889.

■ Turning to Fenestra's backcharge for $2,994.20 for cleanup work done by another subcontractor but which was allegedly Johnson's responsibility, we find that Johnson (through his foreman Jay Stroupe who remained in business in the Pittsburgh area when the Johnsons retired to Florida) was ready, willing and able to perform this work, but that Fenestra followed the course of least resistance in turning to Penn-Allegheny Metal Industries Company rather than pursuing Johnson to complete his obligation. The testimony of Amick (who was the architect's superintendent) indicates that he simply regarded Johnson as non-existent or *functus officio* after receiving word of Johnson's retirement from business, and made no bona fide effort to procure performance by Johnson. Amick, of course, was at liberty to look to Fenestra rather than to Johnson, the subcontractor. But we find the Fenestra likewise simply wrote off the possibility of obtaining performance by Johnson, and because of greater ex-

pedition or convenience simply turned to another subcontractor working at the site to finish the cleanup work. We therefore hold that Johnson is entitled to recover the amount withheld by Fenestra to cover this item.